UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ROBERT STURM,

                               Plaintiff,

-against-

PRIME CAPITAL VENTURES, LLC,

                               Defendant.

Case No.: 1: 23-cv-1033 (DNH/DJS)

**COMPLAINT**

(DEMAND FOR JURY TRIAL)

---

Plaintiff Robert Sturm ("Sturm"), through his attorneys, Hinckley, Allen & Snyder LLP, for his Complaint against Defendant Prime Capital Ventures, LLC ("Prime") alleges as follows:

**PRELIMINARY STATEMENT**

1. Sturm brings this action to recover $2,000,000.00 he delivered to Prime via wire transfer, and that Prime agrees it has no right to retain, but which Prime has refused and/or failed to return to Sturm.

2. Sturm wired $2,000,000.00 to Prime to fund an Interest Credit Account pursuant to a Line of Credit Agreement between Prime and non-party Item 9 Labs Corp. ("Item 9") based substantially on the material misrepresentations that Prime was a bank that would be financing a transaction involving Item 9.

3. The Line of Credit Agreement has been terminated and Prime acknowledges that it is required to return the $2,000,000.00 payment to Sturm.

4. However, Prime invested Sturm's money with an undisclosed hedge fund, and has been benefitting in the form of interest and appreciation from its unauthorized use and retention of Sturm's money.

5. It is undisputed, and both Prime and Item 9 have acknowledged, that the $2,000,000.00 in question belongs to Sturm, and Item 9 directed Prime nearly two months ago to wire the funds back to Sturm.

## PARTIES

6. Robert Sturm is a Colorado resident.

7. Upon information and belief, Prime is a Delaware limited liability corporation with a principal place of business at 66 Pearl Street, Albany, New York.

8. Upon information and belief, the sole member of Prime is Kris Roglieri, a New York resident.

9. The website for Prime Commercial Lending, a Prime affiliate, states that "Kris [Roglieri] owns and operates Prime Capital Ventures which is a dedicated fund under Prime Commercial Lending to fund large commercial real estate, energy and infrastructure projects nationally and internationally."

10. Prime alleged in its complaint in the matter *Prime Capital Ventures, LLC v. Reign Financial International, Inc.*, Case No. 23-cv-207 (N.D.N.Y.), that "Prime is a citizen of the State of New York because Prime's sole member, Kris Roglieri, is a resident of the State of New York." *See id.*, Dkt. No. 1 at ¶ 2.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

12. This Court has personal jurisdiction over Defendant because it maintains its principal place of business in the State of New York, continues to operate commercial enterprises

in New York, and its contacts with New York are sufficient such that exercising jurisdiction over it would not offend traditional notions of fair play and substantial justice.

13. Venue is proper in the Northern District of New York under 28 U.S.C. § 1391(b) because this is a district in which a substantial part of the events or omissions giving rise to the claims occurred, and in which Defendant is subject to the Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

14. On or about October 24, 2022, Prime, as lender, and non-party Item 9, as borrower, entered into an Acquisition Line of Credit Agreement ("LOC Agreement").

15. The purpose of the LOC Agreement was for Item 9 to obtain a $15,000,000.00 line of credit to finance the acquisition of certain assets of a Canadian franchisor called Sessions Cannabis located in Ontario, Canada ("Sessions") by Item 9's wholly owned subsidiary OCG Management Ontario Inc. ("OCG") (collectively the "Transaction").

16. Pursuant to the LOC Agreement, Item 9 was required to fund a $3,000,000.00 reserve account with Prime to serve as an Interest Credit Account ("ICA"), for the purposes of satisfying interest payments under the LOC Agreement after the Transaction closed.

17. Sturm is not and has never been a party to the LOC Agreement.

18. Effective October 28, 2022, Sturm and Item 9 executed that certain Short Term Promissory Note ("Note") whereby Sturm loaned Item 9 the principal sum of $2,000,000.00, to be repaid by Item 9 in full, with interest, by the stated maturity date of January 31, 2023.

19. Upon information and belief, at the time of the Note, the Transaction was scheduled to close in or around early January 2023.

20. Item 9 borrowed the money from Sturm and signed the Note in order to fund the $3,000,000.00 ICA, which sum was to be held in a segregated account by Prime.

21. On or about October 28, 2022, Sturm wired $2,000,000.00 to Prime directly, consistent with the wire instructions provided to him by Prime, at Citi Bank N.A., 388 Greenwich Street, New York, New York.

22. Prime received Sturm's $2,000,000.00 ICA payment.

23. Prime knew that Sturm was the source of the $2,000,000.00 ICA payment.

24. Upon information and belief, upon Prime's receipt of Sturm's money, rather than hold it in a segregated account maintained by Prime, it invested Sturm's money for its own benefit with a third-party hedge fund.

25. Pursuant to the LOC Agreement, Item 9 was eligible to receive the entire $15,000,000.00 line of credit upon the closing of the Transaction.

26. Upon information and belief, it was Item 9's intention to repay Sturm's short-term loan to Item 9, reflected in the Note, from the proceeds of the line of credit from Prime.

27. However, upon information and belief, Prime did not fund the line of credit and the transaction between OCG and Sessions did not close during or prior to January 2023.

28. In or about early 2023, Item 9 approached Sturm seeking an extension of the Maturity Date for the loan as reflected in the Note to facilitate Item 9's stated expectations as to the new closing date for the Transaction.

29. Sturm agreed to accommodate Item 9's request, and Sturm and Item 9 entered into that certain Amendment to Promissory Note dated February 1, 2023, which provided for a new Maturity Date of May 1, 2023 ("First Amendment").

30. On or about April 25, 2023, Prime, Item 9, and OCG executed an Amendment to the LOC Agreement, pursuant to which OCG was substituted for Item 9 as Borrower.

31. The transaction between OCG and Sessions once again failed to close prior to May 1, 2023—the Maturity Date under the First Amendment.

32. Accordingly, Item 9 approached Sturm seeking yet another extension of the Note.

33. This time, Item 9 assured Sturm the transaction would close prior to June 1, 2023, but if it did not, Item 9 committed to return Sturm's short-term loan in full, plus interest, by no later than June 1, 2023.

34. Sturm once again agreed to accommodate Item 9's extension request.

35. Accordingly, Sturm and Item 9 entered into that certain Amendment No. 2 to the Promissory Note dated May 1, 2023 ("Second Amendment").

36. Upon information and belief, notwithstanding the ability and willingness of both Item 9 and Sessions to close the Transaction prior to June 1, 2023, Prime declined to fund the line of credit, which caused the Transaction to terminate.

37. Section 13.7(a) of the LOC Agreement provides:

Provided Borrower has fully satisfied complied with all conditions to Advance, if Lender fails to provide the first (1st Advance when due, pursuant to the Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver written notice in the form of a notarized termination letter, a copy of which is attached hereto as Exhibit G (the Termination Letter to Lender by certified mail. Upon receipt of such notice, Lender shall have fifteen (15) international business banking days from the date of receipt within which to return the ICA Payment to Borrower.

38. Accordingly, on or about June 2, 2023, with knowledge that the Transaction could no longer proceed, Item 9 and OCG sent Prime a notarized termination letter in which, subject to their reservation of rights, Item 9 and OCG exercised their right to terminate the LOC Agreement and requested the refund of the ICA payment ("Termination Letter").

39. Upon information and belief, Item 9 and OCG fully satisfied and complied with all conditions to advance the funds under the LOC Agreement, which Prime does not dispute.

5

40. In the Termination Letter, Item 9 and OCG specifically instructed Prime to wire $2,000,000.00 to Sturm.

41. Upon information and belief, notwithstanding Item 9's written direction to Prime in conformity with the ICA to return Sturm's money to him, Prime took no action to retrieve Sturm's money from the hedge fund to which it had transferred Sturm's funds.

42. Sturm's counsel has made substantial efforts to communicate with counsel for Prime to facilitate the return of Sturm's money.

43. Eventually, Prime, through its counsel, agreed that it would obtain Sturm's money back from the hedge fund and return it to Sturm as soon as it was received and in no event later than August 21, 2023.

44. In reliance on this promise, Sturm did not commence legal action against Prime.

45. Subsequently, Prime advised that it would only return Sturm's money if Sturm executed a release in its favor to which Prime was not otherwise legally entitled.

46. Nevertheless, Sturm's counsel prepared a release and obtained the consent of Item 9 for its execution.

47. Upon sending the release to Prime, its counsel advised that Prime was moving the goal posts yet again, obscurely requiring some different form of release than what had been provided to it from Sturm and Item 9.

48. As of the filing of this Complaint, notwithstanding its several acknowledgements of the $2,000,000.00 as belonging to Sturm, its commitment via email to return the money, and its having been provided a release to which it was not entitled, Prime has not returned the $2,000,000.00 back to Sturm.

49. Prime has no justification, let alone a valid one, to retain Sturm's $2,000,000.00, and upon information and belief, Prime continues to benefit from its unlawful investment of Sturms' money with the hedge fund as if Sturm's money were its own.

50. In connection with Item 9's request to Sturm to fund the ICA payment, Item 9 represented to Sturm, and Sturm understood, that Prime was a bank.

51. It is widely understood that banks are financial institutions that are regulated by federal and/or state regulatory authorities.

52. Consistent with the representations made to Sturm by Item 9 that Prime was a bank, Sturm's counsel repeatedly referred to Prime as a bank to a number of Prime's representatives.

53. In no instance did any such representative contradict or correct Sturm's understanding.

54. Upon information and belief, Prime is not a bank, it is a fund held in a privately owned LLC that intentionally leads the public to believe that it is a bank in order to induce the public to use its lending services.

55. For example, Prime's brand name and web address is "Prime Commercial Lending."

56. On the home page of Prime's website it touts "[w]e are entrepreneurial *bankers* that take a practical approach in underwriting and funding sponsors" (emphasis supplied).

57. Upon information and belief, there is no disclaimer appearing anywhere on Prime's website stating that it is not a bank, or that it is not federally or state regulated.

58. Upon information and belief, Item 9 was led to believe by Prime that it was a bank, and Item 9 repeatedly referred to Prime as such to Sturm.

59. Sturm researched Prime prior to wiring the funds and believed based on Prime's website that it was a bank.

60. Sturm would never have wired $2,000,000.00 to Prime if he did not believe it was a federally or state regulated financial institution.

61. Sturm brings this action for the immediate payment of all sums due and owing to him from Prime and as a direct and proximate result of Prime's deceptive trade practices.

## COUNT ONE: CONVERSION
### (New York law)

62. Sturm incorporates paragraphs 1-61 above as though set forth fully herein.

63. Prime has intentionally and without authority exercised control over Sturm's property and has refused to return Sturm's property.

64. The $2,000,000.00 from the ICA reserve account belongs to Sturm.

65. Prime has no authority in law or equity to retain Sturm's $2,000,000.00 or to invest Sturm's money with a hedge fund.

66. Prime has unlawfully exercised dominion over Sturm's $2,000,000.00, in derogation of Sturm's rights.

67. Sturm had demanded the return of his money and Prime has not done so.

68. Accordingly, Sturm is entitled to $2,000,000.00 in damages and the proceeds of Prime's wrongful investment of Sturm's money.

## COUNT TWO: UNJUST ENRICHMENT
### (New York law)

69. Sturm incorporates paragraphs 1-61 above as though set forth fully herein.

70. Sturm conferred a benefit on Prime by making the $2,000,000.00 payment to Prime.

71. By retaining the $2,000,000.00 without justification, Prime has been enriched at Sturm's expense.

72. By earning an unauthorized return with the hedge fund on Sturm's money, Prime has been enriched at Sturm's expense.

73. It would be inequitable to permit Prime to retain Sturm's $2,000,000.00 or any benefits it has obtained as a result of its wrongful retention of Sturm's funds.

74. Prime must pay Sturm the amount of the benefit conferred upon it by Sturm.

75. Accordingly, Sturm is entitled to $2,000,000.00 in damages, and a constructive trust upon any and all sums paid by the hedge fund to Prime as a result of Prime's investment of Sturm's money.

## COUNT THREE: PROMISSORY ESTOPPEL
### (New York law)

76. Sturm incorporates the allegations of paragraphs 1-61 as if fully set forth herein.

77. Prime promised to Sturm that it would promptly return his money to him including in several emails between counsel.

78. In reliance on Prime's promises, Sturm did not bring suit against Prime and afforded it until August 21, 2023 to return his money as promised, while losing the opportunity to benefit from the investment of his own funds during the passage of time.

79. Prime must be held to the terms of its promises and ordered to return Sturm's funds immediately, in addition to paying to Sturm any unlawful gain it has acquired as a result of his breaches of its promises to Sturm.

80. Prime must be estopped from denying the consequences of its promises to Sturm and the damages Sturm as suffered as a direct and proximate result of the same.

## COUNT FOUR: BREACH OF CONTRACT
### (New York law)

81. Sturm incorporates the allegations of paragraphs 1-61 as if fully set forth herein.

82. Sturm and Item 9 requested that Prime immediately return Sturm's $2,000,000.00 to him, and Prime agreed.

83. In consideration for the parties' agreement, Sturm did not file suit against Prime for months, while nevertheless being deprived of the use of his funds.

84. Prime has now failed and/or refused to return Sturm's money to him as agreed.

85. As a direct and proximate result of Prime's breach of contract, Sturm has been damaged in amounts to be shown at trial.

## COUNT FIVE: CONVERSION
### (Colorado law)

86. Sturm incorporates paragraphs 1-61 above as though set forth fully herein.

87. Prime has intentionally and without authority exercised control over Sturm's property and has refused to return Sturm's property.

88. The $2,000,000.00 from the ICA reserve account belongs to Sturm.

89. Prime has no authority in law or equity to retain Sturm's $2,000,000.00 or to invest Sturm's money with a hedge fund.

90. Prime has unlawfully exercised dominion over Sturm's $2,000,000.00, in derogation of Sturm's rights.

91. Sturm has demanded the return of his money and Prime has refused.

92. Accordingly, Sturm is entitled to $2,000,000.00 in damages and the proceeds of Prime's wrongful investment of Sturm's money.

## COUNT SIX: UNJUST ENRICHMENT
### (Colorado law)

93. Sturm incorporates paragraphs 1-61 above as though set forth fully herein.

94. Sturm conferred a benefit on Prime by making the $2,000,000.00 payment to Prime.

95. By retaining the $2,000,000.00 without justification, Prime has been enriched at Sturm's expense.

96. By earning an unauthorized return with the hedge fund on Sturm's money, Prime has been enriched at Sturm's expense

97. It would be inequitable to permit Prime to retain Sturm's $2,000,000.00 or any benefits it has obtained as a result of its wrongful retention of Sturm's funds.

98. Prime must pay Sturm the amount of the benefit conferred upon it by Sturm.

99. Accordingly, Sturm is entitled to $2,000,000.00 in damages, and a constructive trust upon any and all sums paid by the hedge fund to Prime as a result of Prime's investment of Sturm's money.

### COUNT SEVEN: PROMISSORY ESTOPPEL
### (Colorado law)

100. Sturm incorporates the allegations of paragraphs 1-61 as if fully set forth herein.

101. Prime promised to Sturm that it would promptly return his money to him including in several emails between counsel.

102. In reliance on Prime's promises, Sturm did not bring suit against Prime and afforded it until August 21, 2023 to return his money as promised, while losing the opportunity to benefit from the investment of his own funds during the passage of time.

103. Prime must be held to the terms of its promises and ordered to return Sturm's funds immediately, in addition to paying to Sturm any unlawful gain it has acquired as a result of his breaches of its promises to Sturm.

104. Prime must be estopped from denying the consequences of its promises to Sturm and the damages Sturm as suffered as a direct and proximate result of the same.

## COUNT EIGHT: BREACH OF CONTRACT
### (Colorado law)

105. Sturm incorporates the allegations of paragraphs 1-61 as if fully set forth herein.

106. Sturm and Item 9 requested that Prime immediately return Sturm's $2,000,000.00 to him, and Prime agreed.

107. In consideration for the parties' agreement, Sturm did not file suit against Prime for months, while nevertheless being deprived of the use of his funds.

108. Prime has now failed and/or refused to return Sturm's money to him as agreed.

109. As a direct and proximate result of Prime's breach of contract, Sturm has been damaged in amounts to be shown at trial.

## COUNT NINE: CIVIL THEFT PURSUANT TO C.R.S. § 18-4-401 *et seq.*
### (Colorado law)

110. Sturm incorporates paragraphs 1-61 above as if set forth fully herein.

111. Prime has knowingly retained and/or exercised control over Sturm's $2,000,000.00 without Sturm's or Item 9's authorization.

112. Prime is not lawfully entitled to retain Sturm's $2,000,000.00.

113. Prime wrongfully obtained Sturm's funds, including through its deceptive trade practices, and has refused to return Sturm's money, with the intent to permanently deprive Sturm of the value of the same.

114. Prime also wrongfully conditioned the return of Sturm's money on consideration to which it is not entitled, namely the receipt of a release.

115. As a direct and proximate result of Prime's civil theft of Sturm's property, Sturm has been damaged in the amount of $2,000,000.00.

116. Pursuant to C.R.S.§ 18-4-405, Sturm is entitled to recover from Prime three times the amount of actual damages resulting from such theft, in an amount to be proven at trial, in addition to attorneys' fees and costs.

### COUNT TEN: VIOLATION OF C.R.S. § 6-1-101 *et seq.*
### (Colorado law)

117. Sturm incorporates paragraphs 1-61 above as though set forth fully herein.

118. In the course of its business, including on its website, Prime knowingly misleads the public into believing that it is a bank.

119. It is widely understood that banks are financial institutions that are regulated by federal and/or state regulatory authorities.

120. Prime so misled Item 9 and Sturm in the manner set forth herein.

121. Sturm would never have provided $2,000,000.00 to Prime if he had known that Prime was merely a private company.

122. Moreover, Sturm would have greater recourse and insurance against Prime's misconduct in the event Prime was subject to federal and/or state regulation.

123. Upon information and belief, Prime's deceptive trade practices have a significant public impact.

124. As a direct and proximate result of Prime's deceptive trade practices, Sturm has been damaged in the amount of $2,000,000.00.

125. Pursuant to C.R.S. § 6-1-113, Sturm is entitled to treble damages and reimbursement of his reasonable attorneys' fees and costs.

### COUNT ELEVEN: EQUITABLE LIEN
### (Colorado law)

126. Sturm incorporates the allegations of paragraphs 1-61 as if fully set forth herein.

127. An equitable lien may be declared by a court of equity out of general considerations of justice based on the relations of the parties and their circumstances.

128. The elements of an equitable lien are a debt or duty owed by one party to another and a *res* to which the obligation may be fastened.

129. Prime is in unlawful possession of Sturm's $2,000,000.00 and has made an unauthorized profit by its investment of the same, while depriving Sturm of the opportunity to invest his own funds himself.

130. Accordingly, Sturm requests that the Court impose an equitable lien on $2,000,000.00 of funds that are or come into the possession of Prime, as well as on the amount of any return or profit that Prime has earned on its investment of Strum's funds.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Robert Sturm respectfully demands judgment in this action as follows:

A. Awarding judgment for Plaintiff Sturm and against Defendant Prime in the amount of $2,000,000.00;

B. Awarding Plaintiff Sturm and against Defendant Prime treble damages;

C. Awarding attorneys' fees, costs, and disbursements of this action; and

D. Awarding such further relief as the Court deems just and proper.

DATED: August 22, 2023
Albany, New York

**HINCKLEY, ALLEN & SNYDER LLP**

By: <u>*/s/ Christopher V. Fenlon*</u>
Christopher V. Fenlon
Kieran T. Murphy
30 South Pearl St., Suite 901
Albany, NY 12207-3492
T: 518-396-3100
F: 518-396-3101
E: cfenlon@hinckleyallen.com
   kmurphy@hinckleyallen.com

*Attorneys for Plaintiff Robert Sturm*